# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles 7/17/2026 2:26 PM David W. Slayton, Executive Officer/Clerk of Court, By D. Williams, Deputy Clerk

**JC LAW, PC**
**Jamie Campbell, Esq.** | SBN 343318
7760 Hollywood Blvd. #303
Los Angeles, CA 90046
Tel 714.767.6807
jamie@jclawpc.com

**THE ROTH LAW FIRM, PLLC**
**Richard A. Roth, Esq.** (to be admitted *pro hac vice*)
295 Madison Avenue, Fl. 22
New York, New York 10017
(212) 542-8882
rich@rrothlaw.com

***Attorneys for Plaintiff***

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| KRISTIN SMITH,<br>Plaintiff,<br>vs.<br>RYAN DUDLEY, ASHLEIGH POGUE, NAAVAH LLC, and POGUE CONSTRUCTION CORP.,<br>Defendants. | Case No.: 26STCV22847<br>**COMPLAINT**<br>**JURY TRIAL REQUESTED** |

Plaintiff Kristin Smith ("Smith" or "Plaintiff"), by and through her attorneys, The Roth Law Firm, PLLC, complaining against the defendants Ryan Dudley ("Dudley"), Ashleigh Pogue ("Pogue"), Naavah LLC ("Naavah"), and Pogue Construction ("Pogue Construction" or the "company") (collectively "Defendants"), respectfully allege as follows.

**PRELIMINARY STATEMENT**

This action is about a breach caused by contractual nonperformance. It also seeks damages based on promissory estoppel, detrimental reliance, unjust enrichment, business misrepresentation, and slander. Smith maintained a professional relationship with Pogue and her husband Ben Pogue for nearly a decade.

In short, Smith entered a six-month consulting arrangement in July of 2025 with Pogue and her husband, that eventually expanded into a long-term engagement with drastically increased responsibilities. In the long-term engagement, Smith was directed to work with Dudley and expanded her role greatly while Defendants promised that a formal agreement was being finalized. Defendants, notwithstanding the fact that Smith continued to perform substantial services and incur personal expenses under their agreed-to terms, began to delay the formalization of their relationship. During that time Defendants continued to encourage Smith to continue to perform, representing that the formalized agreement would be forthcoming. Both Smith and her business manager continued to press for the finalization of that formal agreement. Finally, after Smith performed those services, Defendants terminated the relationship, refused to pay her and pushed Smith out of the business arrangement she had already invested substantial efforts and money into.

For these reasons, Smith brings suit.

**THE PARTIES**

1. Plaintiff Smith is a resident of Los Angeles, California.

2. Upon information and belief, Defendant Dudley is a resident of Dallas, Texas. Dudley's actions during the discussions about Smith's transition to an executive role proved that he was acting in a senior executive capacity of Pogue Construction.

3. Upon information and belief, Defendant Pogue is a resident of Plano, Texas.

4. Upon information and belief, Defendant Naavah is a limited liability company organized and existing under the laws of the State of Texas with its principal place of business in Texas.

5. Upon information and belief, Defendant Pogue Construction is a corporation organized and existing under the laws of the State of Texas with its principal place of business in McKinney, Texas.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over Defendants as the acts, transactions and occurrences referred to herein occurred in Los Angeles, California.

7. Venue is proper in this Court because it is where a substantial part of the events, meetings and transactions giving rise to the legal claim took place in Los Angeles County.

## UNDERLYING FACTS

### Smith's Extensive Background and Experience

8. Smith is a wardrobe stylist for celebrities and high net worth individuals.

9. Over more than a decade, she has developed an extensive network of relationships with some of the most influential individuals, luxury brands, media organizations, and decision-makers in the global fashion industry. Those relationships were cultivated through years of professional work, consistent performance, discretion, and the reputation she earned among high-profile and UHNW clients and industry leaders. These relationships constitute a significant professional asset that cannot be readily duplicated.

10. The value Smith brought to Defendants' business extended far beyond styling. She served as a brand strategist, relationship architect, business advisor, and connector, drawing upon years of experience working with celebrities, professional athletes, executives, luxury brands, and high-net-worth individuals.

11. Rather than simply making introductions, Smith opened doors that are not generally available through ordinary commercial channels. These opportunities were made possible only because of the trust, credibility, and reputation she has established over more than a decade within the fashion industry. In reliance on the promises and representations made to her regarding her long-term role within Pogue's business, Smith leveraged these relationships extensively for Pogue’s benefit. She provided access, opportunities, and experiences that substantially elevated Pogue’s visibility, credibility, and position within the luxury fashion and creator industries.

12. For example, Smith personally secured Pogue access to *Vogue World* which took place in Los Angeles, one of the fashion industry's most exclusive invitation-only events. This opportunity was made possible solely through Smith’s longstanding professional relationships with top level executives at *Vogue* and *Conde Naste* and provided Pogue with exposure to influential leaders, luxury brands, media, and creators within the global fashion community. Smith negotiated a ticket to the event for a fraction of what similar guests in Pogue’s category were required to pay.

13. Further, Smith personally secured Pogue’s admission to the Chanel fashion show through her own professional relationships, an invitation that is exceptionally difficult to obtain. Pogue did not meet close to the spending requirement at the time Smith secured the invite.

14. The overwhelming majority of Pogue’s invitations to Paris Fashion Week in March of 2025 to shows were facilitated through FWRD, a company with which Smith had cultivated longstanding professional relationships over many years. Another retailer, Pogue had very little history with and relied on Smith’s reputation and ability to generate large amounts of sales (outside of Pogue) to gain access. Smith had to practically beg Dior and Saks Fifth Avenue for entry to the Dior show for Pogue after being told her spend was not in the level to be considered. In addition, Smith repeatedly secured Pogue complimentary access to exclusive *Vogue* events and other invitation-only industry experiences that are

ordinarily reserved for members or invited fashion professionals. These opportunities collectively enhanced Pogue's visibility, credibility, and access within the luxury fashion industry.

15. Smith conceptualized, planned and executed a once-in-a-lifetime luxury influencer branding experience in Los Angeles that strategically elevated Pogue's profile within the fashion and creator industries. As part of that experience, Smith leveraged her personal network to provide exclusive opportunities, including access to celebrity plastic surgeon Dr. Jason Diamond and introductions to influential individuals within the creator and luxury fashion communities. The experience substantially expanded Pogue's professional network and generated significant social media exposure and public visibility.

16. These opportunities were not the result of publicly available resources or ordinary business development. They were the direct result of relationships Smith spent more than a decade building, maintaining and protecting and are only a small glimpse of the opportunities. Smith presented opportunities that could not simply be purchased or replicated but instead reflected the trust and credibility Smith had earned throughout her career.

17. Additionally, Smith recruited, assembled, and helped develop much of the team that supported Pogue.

18. Through Smith's own network and professional reputation, she identified and introduced key personnel whose contributions became integral to Pogue's continued success. The ability to assemble such a team was itself a direct result of Smith's years of relationship-building and standing within the industry.

19. The value of these contributions cannot be measured solely by the individual introductions themselves. Rather, they represent the culmination of more than a decade of professional investment, reputation-building, strategic relationships, and industry goodwill that Smith chose to leverage as part of

her performance under the agreement and for Pogue's benefit in reliance upon the understanding that the parties would be entering into a long-term strategic business relationship.

20. Smith's contributions extended far beyond providing strategic consulting services. Smith was instrumental in conceptualizing, developing, and executing the relaunch of Pogue's product line and business operations by leveraging more than a decade of experience in luxury fashion, beauty, branding, and influencer industries, as well as her extensive network of high-level professional relationships.

21. Smith championed and advocated for the relaunch of Pogue's product, developing the strategic vision and identifying the resources necessary to bring the project to market. Smith independently leveraged her professional network to identify and secure introductions to one of the nation's premier branding agencies specializing in the beauty industry. Smith also consulted numerous industry experts, utilizing relationships she had cultivated throughout her career to obtain specialized guidance and strategic insight for the benefit of Pogue's business.

22. In addition, Smith identified, vetted, and secured a nationally recognized trademark attorney to protect the company's intellectual property and brand assets. Smith personally purchased internet domain names and other digital assets necessary to establish and protect the company's online presence and intellectual property. Smith did this in furtherance of the business and with the expectation that she would continue serving in a long-term executive leadership capacity.

23. Smith collaborated with Pogue's finance team to develop and strengthen the company's operational and financial infrastructure, offering strategic recommendations regarding business structure, scalability, operational efficiencies, and long-term growth initiatives.

24. Throughout the engagement, Smith continuously leveraged her reputation, professional goodwill, and extensive network of industry relationships to accelerate the company's development and position it for commercial success.

25. The value Smith provided was not limited to introductions. Smith devoted substantial time, expertise, industry knowledge, and personal resources to building the foundation of the business, many of which would have been unavailable to Pogue absent Smith's involvement.

**Smith's Initial Consulting Agreement**

26. Smith began a professional relationship with the Pogues in or about 2018 when Smith was referred to the Pogues.

27. In March of 2025, Pogue shared with Smith on a trip to Paris that she wanted to create an online presence for herself in hopes of launching an influencer career. Pogue had tried doing this on her own and it had never taken off. Smith was supportive and recommended someone Pogue use for content creation. Pogue wanted to really push things to the next level and in July 2025.

28. At that time, Smith began contributing significantly to Pogue.

**Smith Transcends to an Executive Role**

29. In January 2026, Pogue, and her husband, initiated discussions with Smith in expanding her role to an executive level.

30. The discussions promised Smith a long-term engagement role involving executive-level leadership, compensation restructuring, and equity participation.

31. Via text message, at the instance of the Pogues, Smith expressed that a full-time role would require income in the range of $350,000 of annual compensation, as compared to her original consulting arrangement.

32. her concern that a full-time role would require in the range of $350,000 of annual compensation, as compared to her original consulting arrangement.

33. In February 2026, Smith began to work extensively with Dudley, on financial structuring, compensation negotiations, operational responsibilities and formalizing the executive role agreement.

34. Dudley was heavily involved in the implementation of Smith within the business due to her expertise.

35. On February 27, 2026, the parties agreed to pay Smith $250,000 annually with a 10% equity interest in the company, along with a bonus structure.

36. During the February 27 conversation, it was clear that the long-term relationship agreement between the parties would be finalized but the proposed structure would be refined in the meantime.

37. In reliance on being told that the long-term engagement role representations were being drafted, Smith began to perform on the expanded scope of her duties at the company for the next several months. Smith routinely performed work that substantially exceeded the original six-month retainer structure.

38. Smith's expanded scope of duties included brand strategy and creative direction, operational and organizational infrastructure development, sourcing and coordinating high-level branding and creative agencies, identifying and coordinating trademark counsel, business development and partnership negotiations, introducing valuable industry relationships and professional contacts, extensive travel and on-site business support, sponsorship negotiation and campaign execution, staffing and operational recruitment assistance, and continuous availability for time-sensitive executive and business matters that were well beyond the scope of Smith's original consulting arrangement with Defendants.

39. Indeed, Smith routinely worked at a level that substantially exceeded the original limited retainer structure and was consistent with your agreement. She devoted extraordinary professional time and energy to the development of the business, frequently operated beyond traditional working hours, remained continuously available during travel and business activations, expended personal funds in

furtherance of company-related obligations and contributed substantial proprietary strategy, industry goodwill, relationships and business ideation to the venture.

40. In performing these duties, Smith expended extraordinary professional time and energy to the development of the company, including working beyond traditional hours and remaining continuously available during travel and business activations, and contributed both personal funds and proprietary strategy and business ideation to the venture.

41. On March 31, 2026, Dudley texted Smith that a formalized agreement would be forthcoming imminently.

42. On April 7, 2026, a written proposal of the negotiations was sent to Smith via email. This proposal materially deviated from the prior discussions of Smith's new executive role. Missing were equity and bonus projections and proposed compensation terms that had been expressly rejected months prior.

43. Smith continuously communicated her concerns regarding the terms of the written proposal. Pogue continued to assure Smith throughout that they would execute a formal agreement.

**Defendants Breach the Agreement**

44. On or about April 9, 2026, during a business trip in Los Angeles, Defendants expressed concerns over budgets to Smith, in which led to a discussion of limiting the scope of Smith's engagement at the company. Both Pogue and her husband approved the revised structure and instructed Smith to forward the updated agreement materials to Dudley. Following these representations and approval of the new limited scope agreement, Smith continued performing services on behalf of the company, such as travel and operational initiatives based on those assurances.

45. On April 23, 2026, Smith, via text message to Pogue, said that she was becoming increasingly "uneasy" regarding the status of the agreement and lack of finalized terms despite the

substantial expansion of the duties performed in the last few months. A copy of the text is annexed hereto as **Exhibit A.**

46. In response to the April 23 text message, Pogue reassured Smith that Dudley would be sending her updated agreement details.

47. In reliance on that continued assurance, Smith continued performing her services that benefited Defendants.

48. Thereafter, drafts continued to be exchanged of the agreement, including proposed revisions and redlines between Dudley and Andrea Pambechy ("Pambechy") with Smith and Pogue in copy.

49. On May 5, 2026, Pambechy reached out to Dudley to communicate that the contract needed to be finalized by the end of the week, and Smith would be issuing and invoice that day based on the agreed terms, communications between the parties shifted abruptly without any explanation. Smith's previously planned travel was unexpectedly cancelled after she incurred substantial personal expense. Communications became increasingly evasive and dismissive in nature.

50. On May 7, 2026, via email, Ms. Callahan, a Pogue Construction employee that Smith had never dealt with over the agreements, began to make serious demands on Smith for the execution of a confidentiality and non-disclosure agreement.

51. Smith told Ms. Callahan that she was uncomfortable engaging in legal discussions via email.

52. At the same time, on May 8, 2026, Dudley continued to contact Pambechy and Smith via email over purported contract finalization despite actions from Ms. Callahan that suggested that Smith was being removed from the business relationships with Defendants.

53. Defendants repeatedly alleged to Smith that her work and contributions to the business were "invaluable." A copy of the texts is annexed hereto as **Exhibit B.**

54. In May 2026, Defendants told Smith that they were terminating the agreement and pushing Smith out of the business arrangement.

55. Defendants have not been paid outstanding payments since April, 2026.

56. The defendants did make one payment under the terms of the agreement for April 2026 invoice attached **Exhibit C,** which made clear that the invoice was "per agreement,"

**FIRST CAUSE OF ACTION**

**FOR BREACH OF CONTRACT**

57. Plaintiff repeats and realleges all allegations of the Complaint as if fully set forth herein.

58. In July of 2025, Plaintiff and Defendant Pogue entered a six-month consulting arrangement where Smith was to be paid $5,000 per month.

59. Less than six months later, Pogue and her husband wished to expand Plaintiff's role within Pogue Construction Naavah LLC to an executive-level one.

60. Plaintiff and Defendants orally agreed in an implied-in-fact contract to pay Smith $250,000 annually with a 10% equity interest in the company, along with a bonus structure no bonus structure in final agreement, promising that a written agreement would be provided eventually.

61. Although in April of 2026, a written proposal of the negotiations was sent to Plaintiff via email, this proposal materially deviated from the prior discussions of Plaintiff's new executive role, which required revisions before being signed.

62. Plaintiff performed all of her responsibilities within her new role and was paid in the executive-level salary even though no written documentation was finalized of her promotion.

63. Defendant's also terminated Plaintiff's role despite promising to send the finalized written agreement and noting that her contributions were "invaluable" to the company.

64. Defendants breached the oral agreement when they failed to pay Plaintiff for outstanding amounts due for April 2026 and the balance of the contractual term.

65. As a result, Plaintiff has been damaged in an amount exceeding $500,00 which will be proven at trial.

**SECOND CAUSE OF ACTION**

**FOR DETRIMENTAL RELIANCE**

66. Plaintiff repeats and realleges all allegations of the Complaint as if fully set forth herein.

67. As hereinabove alleged, Dudley individually and/or as a senior executive of Pogue Construction promised Plaintiff that she would be paid $250,000 annually with a 10% equity interest in the company, along with a bonus structure.

68. As hereinabove alleged, Plaintiff reasonably relied on Defendant's promises that the written agreement would be provided and revised to fit their orally agreed upon terms, especially since Plaintiff worked in short capacity prior to the long-term arrangement.

69. Plaintiff was injured by her reliance on Defendant's promises in that she undertook and provided substantial work and out-of-pocket expenses and proposed ideas to further the business for the benefit of Defendants.

70. But for Defendant's promises, Plaintiff would not have undertaken and provided the substantial increase in work for the company and paid expenses in connection with her travel for the company on behalf of all Defendants.

71. As a result, Plaintiff has been damaged in an amount exceeding $500,00 which will be proven at trial.

**THIRD CAUSE OF ACTION**

**FOR UNJUST ENRICHMENT**

72. Plaintiff repeats and realleges all allegations of the Complaint as if fully set forth herein.

73. Plaintiff conferred substantial benefits on Defendants and Defendants reaped significant benefits from the work done by Plaintiff. Plaintiff was instrumental in providing strategy and ideation to the company.

74. Defendants benefited from Plaintiff's efforts.

75. It would be against equity and good conscious for Defendants to retain the value of the work Plaintiff conferred upon them and not pay Plaintiff the outstanding amount for the work she performed.

76. In the absence of an enforceable contract, Plaintiff is owed a percentage of the legal fee awards received by Defendants as fair compensation for these benefits she conferred upon Defendants.

77. As a result, Plaintiff has been damaged in an amount exceeding $500,00 which will be proven at trial.

**FOURTH CAUSE OF ACTION**

**FOR BUSINESS MISREPRESENTATION**

78. Plaintiff repeats and realleges all allegations of the Complaint as if fully set forth herein.

79. Defendants repeatedly misrepresented

80. At the time Defendants made the representations that a written agreement would be provided and revised to match their oral discussions, Plaintiff did not know and could not have known that Defendant's representations were false and/or materially misleading, and Plaintiff justifiably relied upon Defendant's misrepresentations.

81. As a result, Plaintiff has been damaged in an amount exceeding $500,00 which will be proven at trial.

82. Plaintiff has been forced to retain counsel as a result of Defendant's wrongful conduct and is entitled to an award of its reasonable attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**

**FOR AIDING AND ABETTING MISREPRESENTATION**

83. Plaintiff repeats and realleges all allegations of the Complaint as if fully set forth herein.

84. Defendants repeatedly misrepresented

85. At the time Defendants made the representations that a written agreement would be provided and revised to match their oral discussions, Plaintiff did not know and could not have known that Defendant's representations were false and/or materially misleading, and Plaintiff justifiably relied upon Defendant's misrepresentations.

86. As a result, Plaintiff has been damaged in an amount exceeding $500,00 which will be proven at trial.

87. Plaintiff has been forced to retain counsel as a result of Defendant's wrongful conduct and is entitled to an award for its reasonable attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**

**FOR DEFAMATION**

88. Plaintiff repeats and realleges all allegations of the Complaint as if fully set forth herein.

89. Following Smith's wrongful termination, Pogue made false and defamatory statements concerning Smith to third parties, including Saks Fifth Avenue and other individuals and business contacts whom Smith had introduced to Pogue during their business relationship. These individuals include Ali Bloom, a Private Client Specialist with Saks Fifth Avenue, with whom Smith

has maintained a trusted professional relationship for approximately ten years across multiple luxury retailers, as well as other industry professionals.

90. Pogue initiated communications with these individuals to discuss the circumstances surrounding the parties' separation and purportedly explain the reasons for the end of the relationship. Notably, the explanations and representations Pogue conveyed to these third parties were never communicated to Smith herself.

91. Upon information and belief, Pogue made false, misleading, and disparaging statements concerning Smith that were calculated to undermine Smith's professional reputation, credibility, and longstanding business relationships.

92. Prior to Pogue's communications, Smith maintained an excellent reputation within the luxury fashion industry and was a respected ambassador and trusted professional partner of Saks Fifth Avenue.

93. Smith's relationship with Saks Fifth Avenue has been cultivated over many years and represents a significant source of professional opportunities and income.

94. As a direct and proximate result of Pogue's statements and communications, Smith has suffered damage to her professional reputation, interference with existing business relationships, and loss of prospective economic opportunities.

95. Smith is informed and believes that Pogue made similar disparaging statements to additional individuals and entities with whom Smith has longstanding professional relationships.

96. The identities of all such individuals and the full extent of Pogue's communications are presently unknown to Smith and will be ascertained through discovery.

97. As a result, Plaintiff has been damaged in an amount exceeding $500,00 which will be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

(i) For compensatory damages in an amount of no less than $500,000;

(ii) For Plaintiff's costs incurred in connection with this action, including reasonable attorneys' fees and expenses, in an amount that exceeds $500,000, and which will be determined at the trial of this action;

(iv) For pre- and post-judgment interest as permitted by law; and

(v) Together with such other and further relief as the Court deems just, proper, and equitable.

Dated: Los Angeles, California
July 17, 2026

JC Law, PC

By: /s/Jamie Campbell
Jamie Campbell, Esq.
7760 Hollywood Blvd. #303
Los Angeles, California 90046

THE ROTH LAW FIRM, PLLC

By: /s/Richard A. Roth
Richard A. Roth, Esq. (to be admitted *pro hac vice*)
295 Madison Avenue, Fl. 22
New York, New York 10017
(212) 542-8882

*Attorneys for Plaintiff*

# EXHIBIT A

26

Ashleigh

Thu, Apr 23 at 12:23

Hey just wanted to touch base! I sent over an email/agreement Sunday with what we talked about and I know Andrea followed up yesterday. Just feeling a little uneasy and want to make sure we are still aligned and  close to solidifying.

Hi!!! Yes! Ryan probably got busy last night after we put back our reply to push send. I'll shoot him a text t

Thu, Apr 23 at 14:33

Can you send me Carly's invoice and I'll get that paid right away

Invoice 0000702.pdf
PDF Document · 25 KB

Thank you!

How much do you tip her?

# EXHIBIT B


11
2 People
out. I'm so inc
grateful for
all the hard
tion, and
support you
You've been invaluable, and it's been wonderful working together in this new and different capacity. At the same time, I have been down this road before and I really wanted to make sure that we protect our friendship in the long run. I've been feeling that if we keep work and personal separate that might be best for both of us.

# EXHIBIT C

**The Clad Life LLC**

management@kristindodsonsmith.com
kristindodsonsmith.com

# INVOICE

**BILL TO**
Naavah LLC
Naavah

**INVOICE #** 1630
**DATE** 05/06/2026
**DUE DATE** 05/13/2026
**TERMS** 7 days

| ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|
| **monthly retainer**<br>April 2026 per agreement | 1 | 20,000.00 | 20,000.00 |
| **travel reimbursement**<br>lyft from lax 4/14 | 1 | 99.00 | 99.00 |
| **travel reimbursement**<br>Uber to DFW | 1 | 130.98 | 130.98 |
| **travel reimbursement**<br>mentos coffee palm springs 4/10 | 1 | 23.59 | 23.59 |
| **travel reimbursement**<br>Kimpton palm springs 4/12 | 1 | 67.92 | 67.92 |
| **travel reimbursement**<br>luggage fee American 4/14 | 1 | 100.00 | 100.00 |
| **Reimbursable Expense Item**<br>Starbucks gift cards | 1 | 100.00 | 100.00 |
| **travel reimbursement**<br>true foods kitchen 4/12 | 1 | 57.45 | 57.45 |
| **travel reimbursement**<br>Joans on 3rd 4/9 | 1 | 62.11 | 62.11 |
| **travel reimbursement**<br>sidecar doughnuts 4/12 | 1 | 53.29 | 53.29 |
| **travel reimbursement**<br>Coachella valley brewing 4/11 | 1 | 77.94 | 77.94 |
| **travel reimbursement**<br>uber 4/10 Palm Springs | 1 | 22.99 | 22.99 |
| **travel fee**<br>3 days | 1 | 3,000.00 | 3,000.00 |

PAID

Thank you for your business. To pay by credit card please email management@kristindodsonsmith.com a 3% fee will be added to the

SUBTOTAL 23,795.27

invoice

## Ways to pay

BANK

View and pay

| | |
|---|---|
| TAX | 0.00 |
| TOTAL | 23,795.27 |
| PAYMENT | 23,795.27 |
| BALANCE DUE | **$0.00** |